**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| PROGRESSIVE CASUALTY INSURANCE COMPANY,<br>300 N. COMMON BOULEVARD<br>MAYFIELD VILLAGE, OH 44143,<br><br>and<br><br>THE PROGRESSIVE CORPORATION,<br>300 N. COMMON BOULEVARD<br>MAYFIELD VILLAGE, OH 44143,<br><br>*Plaintiffs*,<br><br>v.<br><br>FREDERICK L. STADELBAUER<br>4100 SUGARLOAF DRIVE<br>AUSTIN, TX 78738,<br><br>*Defendant*. | Case No.: _____<br><br><br>Judge _____<br><br><br><br>**COMPLAINT WITH REQUEST FOR INJUNCTIVE RELIEF**<br><br>**(JURY DEMAND ENDORSED HEREON)** |

Plaintiffs Progressive Casualty Insurance Company and The Progressive Corporation (collectively "Progressive"), by and through the undersigned counsel, allege as follows:

**INTRODUCTION**

1.      Defendant Frederick L. Stadelbauer (hereinafter, "Stadelbauer") is a former Progressive equity-level Business Leader who recently voluntarily resigned his employment to take a comparable position at one of Progressive's main competitors—Government Employees Insurance Company ("GEICO")—in breach of certain Restricted Stock Unit Award Agreements (the "Stock Agreements") he executed during his employment at Progressive in exchange for lucrative awards of company restricted stock units. True and accurate copies of Stadelbauer's

Stock Agreements from 2021 through 2026 are attached as Exhibits A through G and are incorporated herein by reference.

2.      Among other things, the Stock Agreements contain non-compete, non-solicitation, and non-disclosure provisions prohibiting Stadelbauer from unfairly competing with Progressive or soliciting other Progressive employees for 12 months following his departure from the company, and permanently barring him from using or disclosing Progressive's confidential and/or proprietary information and/or trade secrets.

3.      These restrictions are legally necessary to protect Progressive's highly confidential and proprietary business information, trade secrets, and its substantial investment in equity-level senior leaders, whose intimate knowledge of Progressive's proprietary systems, strategies, and processes would be invaluable to Progressive's competitors, like GEICO. These restrictive covenants are equally legally necessary due to the highly competitive nature of the auto insurance industry.  That said, Progressive applies these agreements with precision, only offering equity in exchange for agreement to these restrictive covenants to those with intimate knowledge of its proprietary and confidential business information. In fact, when including employees of subsidiaries and affiliates, less than 2% of Progressive's workforce is stock-eligible, and less than 0.5% of all employees (approximately 300) are of the seniormost level subject to the Stock Agreements' non-compete covenant.

4.      As set forth in detail below, Stadelbauer has not only breached his non-compete restrictions by accepting employment with one of Progressive's top direct competitors,  it appears he has also compiled confidential strategy documents (including specific documents relating to Progressive's strategies for competing with GEICO) to share with GEICO in violation of his confidentiality obligations, in addition to utilizing (intentionally or inevitably) his existing

2

knowledge of Progressive's confidential information for GEICO's benefit, as his new position will inevitably require.

5.      Accordingly, Progressive seeks preliminary and permanent injunctive relief to prevent further irreparable harm to its legitimate business interests, including the protection of its trade secrets and competitive advantage, as well as monetary relief, attorneys' fees, and other relief as this Court deems proper.

## PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff Progressive Casualty Insurance Company ("PCIC") is an Ohio corporation formed and existing under the laws of the State of Ohio with its principal place of business at 300 North Commons Blvd., Mayfield Village, Ohio 44143.  PCIC was Stadelbauer's employer, is a wholly owned subsidiary of The Progressive Corporation ("TPC"), and is a beneficiary of the Stock Agreements' restrictive covenants.

7.      Plaintiff TPC is an Ohio corporation formed and existing under the laws of the State of Ohio with its principal place of business at 300 North Commons Blvd., Mayfield Village, Ohio 44143. TPC is the contracting entity on the Stock Agreements.

8.      Defendant Stadelbauer is an individual who resides at 4100 Sugar Drive, Austin, Texas 78738.

9.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332, because there exists complete diversity of citizenship between the Plaintiffs and the Defendant. PCIC and TPC are both Ohio corporations headquartered in Mayfield Village, Ohio, and are therefore citizens of Ohio for purposes of determining diversity jurisdiction. Stadelbauer is an individual who resides in Austin, Texas. No plaintiff is a citizen of the State of Texas, and no defendant is a citizen of the State of Ohio. The total amount in controversy resulting from

Stadelbauer's conduct well exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

10.     This Court has personal jurisdiction over Stadelbauer because he consented to personal jurisdiction in all "state and federal courts located in Cuyahoga County of the State of Ohio," which includes the United States District Court for the Northern District of Ohio. (Ex. A ¶ 15(f).) Stadelbauer also has significant contacts with Ohio: Stadelbauer was employed by PCIC (a company headquartered in Ohio), made frequent work-related trips to Ohio, specifically including to Progressive's corporate headquarters in Mayfield Village, and entered into contracts governed by Ohio law with an Ohio corporation in connection with his employment.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Progressive's principal place of business is located in Mayfield Village, Ohio, in the Northern District of Ohio, Eastern Division. Furthermore, the Stock Agreements on which Progressive's claims are based provide that any claim must be "brought and litigated exclusively in the state or federal courts located in Cuyahoga County of the State of Ohio," which includes the United States District Court for the Northern District of Ohio. (Ex. A ¶ 15(f).)

## FACTUAL ALLEGATIONS

### A.     Progressive's Business

12.     Progressive is a national insurance company headquartered in Mayfield Village, Ohio. Progressive primarily offers personal and commercial auto, property, and specialty insurance products to customers throughout the United States through a network of independent insurance agents and direct-to-consumer sales.

13. Progressive's personal auto insurance business is the largest business division in the company on a net written premium basis, and is responsible for approximately $66 billion in annual revenue.

14. One of Progressive's primary competitors in the nationwide personal auto insurance business is GEICO. GEICO is the largest writer of auto insurance in the highly competitive direct-to-consumer channel, and is a recent entrant in the independent agent channel,[1] where Progressive has competed for close to 90 years and has built the largest market position.

**B.      Stadelbauer's Roles and Increasing Responsibilities at Progressive**

15. Stadelbauer was initially hired by Progressive in 2012 as a Product Manager and progressed through the organization until he was promoted to the role of Business Leader in approximately June 2021. Stadelbauer subsequently served as a Business Leader within Progressive's national personal auto insurance business until submitting his voluntary resignation on April 24, 2026.

16. Business Leaders are among Progressive's most senior leaders, with broad access to Progressive's highly confidential, proprietary, and trade secret information (hereinafter, "Confidential Information"). Business Leaders are part of a very small percentage of Progressive employees who are eligible to receive restricted stock units ("RSUs") as part of their compensation package.

---

[1] *See, e.g.,* "News Brief: Geico Turns to Independent Agents, Progressive Closes in on State Farm, and Best Places for Remote Work," (Jan. 25, 2024) ("As major carriers leverage their independent agent networks more, Geico has focused on its field reps. That appears to be changing. Sources tell P&C Specialist that the company is piloting a program to use independent agents."), *available at* https://www.pandcspecialist.com/lead/enroll/4399434/570964?from=https%3A%2F%2Fwww.pandcspecialist.com%2Fc%2F4399434%2F570964%3Freferrer_module%3DissueHeadline%26module_order%3D0&referrer_module=issueHeadline

17. Stadelbauer was one of only six Field Business Leaders working in Progressive's personal auto product management group.

18. In his role as a Business Leader, Stadelbauer oversaw and was involved in almost every aspect of Progressive's national personal auto insurance business. Among other things, he had broad leadership accountability for state and regional profit and loss, which includes responsibility for understanding, contributing to, and deploying countrywide initiatives throughout his region related to product performance, pricing, profitable growth strategies, underwriting and verification, and product development and deployment. Those responsibilities necessarily required access to proprietary and highly confidential, non-public information regarding Progressive's nationwide products, pricing strategies and philosophies, underwriting and verification models, strategic priorities, competitive positioning, and future business plans, among others.

19. Stadelbauer's broad leadership responsibilities, special assignments, and cross-functional projects were national in scope, benefiting the entire auto insurance business and even other business lines, and providing him access to Progressive's competitively advantageous Confidential Information concerning Progressive's nationwide personal auto business operations.

20. In particular, Stadelbauer's national access to Confidential Information flowed from Progressive's core personal auto insurance product models, which are deployed across all states, with state-specific regulatory, legislative, and market-based variations, where necessary.

21. This national scope was true regardless of the state or territory in which he supervised Product Managers while a Business Leader.

### 1. Special Projects, Competitive Initiatives, and Media Strategy

22. Stadelbauer's leadership responsibilities and assignments at Progressive gave him direct access to Confidential Information, strategies, and processes in a variety of areas that would

be highly valuable to Progressive's competitors, and would cause substantial competitive harm to Progressive if disclosed to or utilized by those competitors.

23. Stadelbauer was regularly entrusted with work on sensitive and confidential competitive initiatives, including efforts to grow Progressive's agent and customer base in key states such as Florida and Texas. This work required access to Progressive's confidential strategic plans, financial analyses based on proprietary company data, and tactical plans that are not available to competitors and that have been developed by Progressive at substantial cost in both time and money. This information informs where and how Progressive seeks to grow in particular markets—information that likewise would be highly valuable to Progressive's competitors, including GEICO, and would cause substantial competitive harm by, among other things, allowing competitors to obtain the benefits of Progressive's significant investment in researching and developing these strategies and systems at no cost.

24. In addition to his regional and independent agency channel responsibilities over multiple years as a Business Leader, Stadelbauer also led a cross-functional, nationwide effort to grow Progressive's bundled products—a business initiative that focuses on selling multiple Progressive insurance products together, such as home and auto policies—which is a priority business initiative for Progressive. That work required detailed knowledge of the performance of Progressive's auto policies when bundled with property policies, the intersection of Progressive's two product lines, financial tradeoffs, segmentation strategies, and national strategy for leveraging auto insurance performance to support broader company-wide objectives. This information would be highly valuable to Progressive's competitors, including GEICO.

25. As just one example, Stadelbauer has extensive knowledge of Progressive's confidential strategies—developed over many years—regarding actuarial methods, pricing and

product solution methodologies, and discounts, including granular details of how Progressive determines the amount and timing of discounts based on Progressive's proprietary data. These strategies are important to Progressive's ability to maximize customer acquisition and retention while maintaining profitability, and Stadelbauer attended meetings recently at which the company discussed proposed changes to those prices and discounts to stay ahead of the market. If GEICO obtains access to this information from Stadelbauer, it could pursue these strategies in short order, bypassing the extensive work and analysis Progressive has done to develop these strategies. This Confidential Information would be highly valuable to Progressive's competitors, including GEICO, and would allow them to compete unfairly against Progressive and harm Progressive's business, including bypassing years of work and investment in these areas.

26. Along these same lines, Stadelbauer was responsible for creating and contributing to internal, company-wide playbooks used nationally by Product Managers, Business Leaders, and General Managers. These playbooks are confidential and set out non-public internal strategies for growth, including how to make adjustments to product offerings, distribution tactics, and pricing methodologies. They embody company-wide institutional knowledge and strategic decision-making unique to Progressive. On two occasions in the past five years, including 2025, Stadelbauer led the development of these materials and chaired the committee responsible for Progressive's lines-of-business playbooks and competitive response plans. This Confidential Information would be highly valuable to Progressive's competitors, including GEICO, and would allow them to compete unfairly against Progressive and harm Progressive's business, including bypassing years of work and investment in these areas.

27. For a number of years leading up to his voluntary resignation, Stadelbauer was a key subject-matter expert on Progressive's in-house media strategy, including billions of dollars

in digital and mass media spending. He has detailed knowledge of Progressive's media budgets and strategies. Stadelbauer understands how internal targets are derived, and how they translate into actual media exposure and customer acquisition for Progressive. As just one example, Stadelbauer has deep knowledge of Progressive's Confidential Information, developed over the course of many years and with the tremendous investment of in-house data analysis, regarding the emerging digital and mass-media marketing space and how to maximize Progressive's return on its multi billion-dollar marketing expense. This Confidential Information would be highly valuable to Progressive's competitors, including GEICO, and would allow them to compete unfairly against Progressive and harm Progressive's business, including bypassing years of work and investment.

28. Stadelbauer has substantial knowledge of and involvement in Progressive's confidential processes for making underwriting and verification-related decisions, including design considerations for evaluating policy risk and identifying potential fraud, setting thresholds for offering, verifying, or declining policies where permitted, and adjusting models in response to emerging issues. He has knowledge of Progressive's proprietary underwriting and verification models, including upcoming changes to those models, as well as confidential training materials that explain Progressive's unique processes for determining when and how to write policies that competitors do not generally possess.

29. In his role as a Business Leader, Stadelbauer had access to Progressive's national macro- and micro-pricing strategies and models, as well as non-public monthly reports, including without limitation, monthly summaries of performance and progress. Stadelbauer is aware of how Progressive's national pricing strategies were developed, how they were faring, and how pricing recommendations were made to different states and within particular segments. This Confidential

9

Information would be highly valuable to Progressive's competitors, including GEICO, and would allow them to compete unfairly against Progressive and harm Progressive's business.

30.     Mr. Stadelbauer also had access to and used Progressive's highly confidential annual strategic objectives, including sensitive information about planned model enhancements and internal analyses regarding nationwide deployment. Mr. Stadelbauer also possesses Confidential Information and strategic plans regarding corporate development strategies and future product development, business expansion, or growth opportunities. This information reflects forward-looking strategy and internal assessments that are closely protected by Progressive. If GEICO were to learn Progressive's non-public strategies, it could compete unfairly with Progressive and could irreparably harm Progressive's future business plans.

31.     Stadelbauer also served on the national Product Manager Recruiting team, was the face for Progressive for recruitment at targeted business schools, and had access to detailed personnel information for Progressive's top talent. Stadelbauer also had access to confidential internal training materials used to train Progressive employees, including Business Leaders and Product Managers.

32.     This Confidential Information would be highly valuable to Progressive's competitors, including GEICO, and would allow them to compete unfairly against Progressive and harm Progressive's business, including bypassing years of work and investment.

### 2.     The Independent Agent Channel

33.     Progressive sells many of its auto insurance policies and products through what is known as the "independent agent channel"—a distribution channel in which licensed independent insurance agents compare and sell insurance policies from multiple insurance carriers, in contrast with captive agents, who represent and sell policies from a single insurance company.

10

34.     Progressive's sales through independent agents are a critical component of the company's business and competitive advantage. Progressive has utilized independent agents for nearly 90 years, and has built the largest market position in this space.

35.     Upon information and belief, GEICO (who is the largest writer of auto insurance in the highly competitive direct-to-consumer channel) recently entered the independent agent channel and is attempting to build its private passenger auto market share, including in large states like Texas and Florida.

36.     By hiring Stadelbauer, GEICO could leverage his knowledge of Progressive's Confidential Information developed through its vast experience in the independent agent channel, which Stadelbauer had access to and learned while in his Product Manager and Business Leader roles.

37.     Through his role as a Business Leader at Progressive, Stadelbauer had access to processes and strategies for optimizing Progressive's market position in the independent agent channel, including how independent agents evaluate, compare, and present insurance products to consumers and the comparative rating platforms they use to do so. Stadelbauer also had detailed, non-public knowledge of how Progressive's systems interact with the mechanics of those platforms, and the internal factors that influence how Progressive's products appear, are ranked compared to Progressive's competitors, and are selected by the independent agents, and up until the time of his departure was receiving the results of the company's testing in this area. This Confidential Information would be highly valuable to Progressive's competitors, including GEICO (which has only recently entered the independent agent channel) and would allow them to compete unfairly against Progressive and harm Progressive's business, including bypassing years of work and investment in these areas.

### 3. Stadelbauer's Stock Agreements with Progressive

38. Progressive issues annual awards of RSUs to eligible employees via Stock Agreements like those executed by Stadelbauer. Again, as noted above, less than 2% of Progressive's employee population are stock-eligible.

39. Because of the nature of these stock-eligible roles, and the critical proprietary and highly confidential information on Progressive's current and future business plans to which they have access, Stock Agreements since 2021 have contained certain contractual covenants to protect against unfair competition and disclosure of Confidential Information, including non-compete, non-disclosure, and employee non-solicitation provisions. These specific covenants in Progressive's Stock Agreements have remained virtually identical since 2021.

40. The non-disclosure provisions have no expiration, as is customary and necessary to protect Progressive's Confidential Information from unlawful disclosure. These non-disclosure provisions apply to all equity-level employees, and also largely track the same obligations outlined in Progressive's Code of Business Conduct and Ethics (the "Code of Conduct") (see below), which all employees (including Stadelbauer) are required to acknowledge upon hire and periodically thereafter.

41. The employee non-solicitation provision also applies to all equity-level employees during their employment and for one year after the end of their employment. The non-compete provision, by comparison, only applies to a small subset of seniormost equity-level employees, as they have access to the most highly competitive and confidential business information. Again, as noted above, less than 0.5% of Progressive's employee population is subject to the one-year non-compete provision.

42. Each year since 2012, Stadelbauer executed a new Stock Agreement with Progressive and received awards of RSUs. And starting in 2021, those Stock Agreements included substantially identical non-compete, non-solicitation, and non-disclosure provisions.

43. Since 2021 alone, Stadelbauer received more than 6,000 RSUs via Stock Agreements, and more than half of those RSUs vested prior to Mr. Stadelbauer's voluntary resignation. Based on the closing price of $198.42 per share for Progressive stock on May 12, 2026—the date Stadelbauer announced his new role at GEICO—and accounting for dividends, the RSUs awarded to Mr. Stadelbauer since 2021 are valued at approximately $1.27 million, and those RSUs that vested prior to his resignation are valued at approximately $662,942.[2]

44. Section 12 of the Stock Agreements states that Stadelbauer "shall not directly or indirectly recruit or solicit for hire, or assist in any manner in the recruitment or solicitation for hire, any employee or officer of Progressive, in each case involving employment by any individual, business or entity other than Progressive, or in any way induce any such employee or officer to terminate employment with Progressive." This restriction applies for a period of twelve months following the termination of his employment for any reason.

45. Section 13 of the Stock Agreements states that Stadelbauer "shall not directly or indirectly, on [his] own account or on account of any other person or entity (except in the authorized course of [his] employment with Progressive), engage in any Competitive Activity," as defined by the Stock Agreements. This restriction applies for a period of twelve months following the termination of his employment with Progressive for any reason.

---

[2] Progressive calculated the approximate value of Stadelbauer's equity utilizing a per share price of $198.42, which was the share value of PGR stock at the close of the stock exchange on May 12, the day on which Mr. Stadelbauer announced he had joined GEICO.

46. Section 14 of the Stock Agreements states that Stadelbauer "has an obligation to maintain the confidentiality of Confidential Information, including any records containing Confidential Information," and will not "use or disclose, directly or indirectly, any of Progressive's Confidential Information which [he] may develop, obtain or learn about during or as a result of [his] employment by Progressive" at "all times during and after [his] employment" with Progressive.

47. Pursuant to Section 15 of the Stock Agreements, Stadelbauer further agreed that the harm to Progressive arising "from a breach or threatened breach of [the non-compete, non-solicitation, and non-disclosure provisions] are irreparable and difficult to measure and that money damages alone would be an inadequate remedy for any such breach," and therefore Progressive has the right to seek equitable relief for any breach of those restrictive covenants in addition to other relief. Section 15 of the Stock Agreements further provides that the non-compete restrictions apply to Stadelbauer, as his "assigned salary grade level [was] 50 through 53" on the date he was granted each Equity Award from 2021 to 2026. Specifically, Stadelbauer was assigned grade level 50 as a Product Manager III at the time of his March 2021 grant, and was assigned grade level 52 as a Business Leader at the time of all subsequent grants.

**4. Stadelbauer's Acknowledgment of Progressive's Code of Conduct**

48. In addition to his Stock Agreements, as a Progressive employee, Stadelbauer was required to adhere to Progressive's Code of Conduct.

49. Under the Code of Conduct, employees may not disclose Progressive's confidential or proprietary information, a restriction that applies at "all times during your employment with . . . Progressive and will continue indefinitely after your employment (or service) ends until such time, if any, that Progressive gives you express authorization to use or disclose Proprietary Information."

14

50.     On or about December 17, 2018, Stadelbauer completed an acknowledgment of that Code of Conduct.

**C.     Stadelbauer's Resignation from Progressive and Employment at GEICO**

51.     On April 24, 2026, Stadelbauer submitted his voluntary resignation to Progressive. As a result, the non-compete and non-solicitation provisions in his Stock Agreements will remain in force until at least April 24, 2027.

52.     Nevertheless, on May 12, 2026, Progressive learned through a public LinkedIn post that Stadelbauer had accepted a role at GEICO as Vice President of State Product Management. This is particularly concerning because the Vice President of State Product Management role appears to be a product role within GEICO that would be very similar to the Product Manager and Business Leader roles Stadelbauer held at Progressive.

53.     In working at GEICO, Stadelbauer is engaging in activities that are the same as or similar to the actual or proposed activities, products, or services of Progressive's Core Business (as defined in the Stock Agreements), with respect to which Stadelbauer had knowledge of or access to Progressive's Confidential Information, and which reasonably could—and inevitably would—require Stadelbauer, in whole or in part, to rely on, use, or disclose Progressive's Confidential Information, in violation of the non-compete and non-disclosure provisions in his Stock Agreements.

54.     Progressive also has learned that two days before announcing his resignation, Stadelbauer sent multiple requests to colleagues for Confidential Information, including specific information relating to GEICO.

55.     On April 22, 2026, Mr. Stadelbauer requested that a colleague provide him with a confidential presentation concerning a specific Progressive business plan regarding a product line

lying outside of his core responsibilities, which he subsequently received. Although the information in that presentation may have been relevant to Mr. Stadelbauer's duties generally, he was not actively working on that specific initiative at the time he made the request. The presentation contained non-public information regarding Progressive's business strategies that would be highly valuable to Progressive's competitors, specifically including GEICO, and would cause substantial competitive harm and irreparable injury to Progressive if disclosed to or utilized by competitors. The email references a presentation scheduled to take place the following Monday, April 27, 2026—the next business day after Stadelbauer resigned from Progressive.

56. Also on April 22, 2026, Stadelbauer requested and received specific data relating to Progressive's performance in the market relative to GEICO. Again, this information is both highly confidential and would be directly relevant to his new position at GEICO, and could be utilized to GEICO's advantage to allow them to compete unfairly against Progressive and harm Progressive's business.

57. And yet again on April 22, 2026, Stadelbauer asked another Business Leader to provide him with information related to the independent agent channel from a company playbook as well as the latest PowerPoint presentation that referred to that information. As discussed below, Progressive's playbooks are confidential and set out non-public internal strategies for growth, how to make adjustments to product offerings, distribution tactics, and pricing methodology. They embody company-wide institutional knowledge and strategic decision-making unique to Progressive that would cause irreparable harm to Progressive if disclosed to a competitor.

58. Upon information and belief, Stadelbauer has disclosed or intends to disclose the foregoing Confidential Information to GEICO, or to use that Confidential Information therein for GEICO's benefit.

59. In addition to the specific examples above, and given the extent of Stadelbauer's knowledge of Progressive's Confidential Information in various substantive areas as set forth above, including particularly its highly confidential strategies for competing directly with GEICO, it is inevitable that Stadelbauer would regularly utilize Progressive's Confidential Information to his and GEICO's benefit if allowed to continue in his new employment as a Vice President at GEICO. And that is made plainly evident based on the actual breaches that Progressive has already uncovered, and likely will continue to uncover, as this case proceeds. Once Progressive's Confidential Information is unlawfully disclosed for the benefit of a direct competitor's use, it not only constitutes unfair competition, but will deprive Progressive of the benefit of its bargain with Stadelbauer for which he received lucrative stock awards.

**COUNT I: BREACH OF CONTRACT/PERMANENT INJUNCTIVE RELIEF**

60. Progressive reasserts and incorporates herein by reference its allegations contained in each of the foregoing paragraphs as if fully set forth herein.

61. The Stock Agreements are valid, enforceable contracts between TPC and Stadelbauer, and PCIC is an intended third-party beneficiary of the Stock Agreements' restrictive covenants as a wholly owned subsidiary of TPC and Stadelbauer's employer at the time he accepted the Stock Agreements.

62. Progressive performed its obligations under the Stock Agreements by, among other things, providing Stadelbauer with the RSUs set forth therein.

63. The non-compete, non-solicitation, and non-disclosure provisions of the Stock Agreements are reasonable in scope, duration, and geographic location, and are necessary to protect Progressive's legitimate business interests, including, but not limited to, protection through non-disclosure of Progressive's Confidential Information.

64.     As described in detail above, and in direct breach of the non-compete provisions of the Stock Agreements, Stadelbauer is engaging in activities that are the same as or substantially similar to the actual or proposed activities, products, or services of Progressive's Core Business (as defined in the Stock Agreements), with respect to which he had knowledge of or access to Progressive's Confidential Information, and which reasonably could—and inevitably would—require Stadelbauer, in whole or in part, to rely on, use, or disclose Progressive's Confidential Information.

65.     As described in detail above, and in direct breach of the non-disclosure provision of the Stock Agreements, Stadelbauer has failed to maintain the confidentiality of Progressive's Confidential Information, and has used, disclosed, or relied upon, directly or indirectly, Progressive's Confidential Information to GEICO, and will continue to do so long as he remains employed there.

66.     Progressive has suffered and will continue to suffer monetary damages well in excess of $75,000 as a direct and proximate result of the foregoing breaches of the Stock Agreements, including, but not limited to, attorneys' fees incurred in this action.

67.     Additionally, Progressive has suffered and will continue to suffer irreparable harm as a direct and proximate result of the foregoing breaches of the Stock Agreements, for which Progressive has no adequate remedy at law.

68.     Accordingly, in addition to monetary damages, attorneys' fees, and other relief, Progressive is entitled to preliminary and permanent injunctive relief to prevent the ongoing irreparable harm caused by Stadelbauer's breaches of the Stock Agreements, including, but not limited to, disclosure of its Confidential Information to a direct competitor.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Progressive prays as follows:

A.  That Stadelbauer be preliminarily and permanently enjoined from acting on behalf of or accepting, or continuing, employment with GEICO for a period of twelve months from the date of the Court's Order, consistent with the terms of the Stock Agreements;

B.  That Stadelbauer be preliminarily and permanently enjoined from disclosing any of Progressive's Confidential Information (as defined in the Stock Agreements) indefinitely and irrespective of whether he accepts employment at GEICO or another competitor after the expiration of his non-compete term;

C.  That Stadelbauer be preliminarily and permanently enjoined from directly or indirectly soliciting or inducing any employee or officer of Progressive (including subsidiaries and affiliates) to terminate their employment, consistent with the terms of the Stock Agreements;

D.  That Progressive be awarded actual, compensatory damages proximately caused by Stadelbauer's unlawful and/or inequitable conduct;

E.  That Progressive be awarded its reasonable attorneys' fees and costs; and

F.  That the Court award such other and further relief, both legal and equitable, as is warranted by the facts and the applicable law.

## DEMAND FOR JURY TRIAL

Progressive hereby demands trial by jury on all issues so triable.

DATED: May 18, 2026

Respectfully submitted,

*/s/ Steven M. Dettelbach*
Steven M. Dettelbach (0055848)
Scott C. Holbrook (0073110)
Carrie A. Valdez (0094004)
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114-1214
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
sholbrook@bakerlaw.com
sdettelbach@bakerlaw.com
cvaldez@bakerlaw.com

Kevin W. Shaughnessy (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, Florida 32801
Telephone: (407) 649-4000
kshaughnessy@bakerlaw.com

*Counsel for Plaintiffs*

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2026, a copy of the foregoing Complaint with Request for Injunctive Relief was filed electronically via the Court's ECF System and a copy may be accessed through the Court's ECF filing system. A copy of this filing will also be served upon Defendant's last known personal email address, and upon counsel as soon as such counsel is identified to Plaintiffs.

*/s/ Steven M. Dettelbach*
*Attorney for Plaintiffs*
